## COMMANDER DOOR, Inc. v. DUNSMUIR LUMBER CO.

### No. 13074.

United States Court of Appeals
Ninth Circuit.

May 21, 1952.

Gladstein, Andersen & Leonard, San Francisco, Cal., for appellant.

Carlton & Shadwell, Redding, Cal., for appellee.

Before DENMAN, Chief Judge, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

Appellant, here called Commander, brought this action to recover damages for an alleged breach of a written contract for the purchase by it from the appellee, here called Dunsmuir, of quantities of lumber which Commander desired for use in the manufacture of doors. Under date of March 3, 1950, Commander executed its own printed form of "purchase order" addressed to Dunsmuir and requesting shipment of a number of carloads of lumber to be cut to stated specifications. In addition to stating the prices to be paid, with other specifications for manufacture and shipment, the instrument contained a shipping schedule calling for 22 carloads over a period beginning March 15, 1950, and thereafter at stated intervals to December 1 in the same year. The order recited "The prices on this order are firm." It also contained the printed provision "It is understood and agreed that any unshipped portion of this contract may be canceled at any time, without cost to us." The so-called order was accepted by the signature of Dunsmuir's president at a place provided for that purpose upon the order form.

The parties began performance under their agreement and shipments were made in accordance with the schedule until the month of July, 1950, when Dunsmuir demanded a 7% increase in the price paid for shipments to be made thereafter. This was agreed to, and additional shipments were made. But the carloads listed in the shipping schedule for shipment on October 1 and subsequent dates were not shipped, and Dunsmuir notified Commander that it was unable to ship any more cars under the agreement. This action followed. Commander, the plaintiff, alleged that had it received the additional shipments listed in the schedule it would have been able to manufacture some 5350 doors therefrom at a profit of $4.00 for each door; that it was unable to procure comparable lumber elsewhere, and that in consequence of

Dunsmuir's failure to make the deliveries, it lost profits of $21,200.[1]

At the trial before the court sitting without a jury, Commander proved the execution of the written instrument referred to; proved the refusal of Dunsmuir to make all the scheduled shipments, and introduced evidence of the resulting loss of profits. At the conclusion of this testimony, Dunsmuir moved for a dismissal of the action pursuant to Rule 41(b) of the Rules of Civil Procedure, 28 U.S.C.A., on the ground that the contract recited that "any unshipped portion of this contract may be canceled at any time without cost to us." Upon the Judge indicating that he was inclined to grant the motion, the plaintiff asked and was granted leave to reopen the case in order to enable it to make an offer of additional testimony. A number of such offers were then made and all of them rejected by the court, including an offer to prove through the testimony of Dunsmuir's president that the latter would not have executed the contract except upon the understanding that it was to be a firm order, and a non-cancellable contract as to quantities to be shipped.

Commander also offered two letters, one from it to one Bennett, a lumber broker through whom the contract was negotiated, dated July 25, 1950, and Bennett's reply thereto dated July 27, 1950. These letters, to be discussed hereafter, are set forth in full in the margin.[2] Also offered were some letters exchanged between Command-

---

1. Commander also had a second cause of action upon which it recovered and which is not material here.

2. "Mr. T. D. Bennett     July 25, 1950
T. D. Bennett Lumber Co.
Sherlock Building
Portland 4, Oregon

"Dear Ted: This will acknowledge receipt of your letter of the 21st and to advise that our order with you and Dunsmuir Lumber Company was a firm order and was not placed with you with the understanding that the prices were to be made at time of shipment.

"I have just talked to Mr. Rygel and he advises that he refuses to make further shipments unless we accept a 7% increase on the stock he is furnishing. Inasmuch as we are committed to manufacture and deliver Commander Doors to our dealers based on the price of our firm order to you, we have no alternative but to say 'go ahead'. It is my understanding after talking with Mr. Rygel that he will proceed and make shipment in accordance with the schedule with doors he is to manufacture for us.

"In the last car MEC 4782, there were 9,000 pieces which should have been 3½″ wide x 19¼″ long. These pieces arrived 3½″ to 3⅝″ wide at one end tapering to 3⅛″ and 3¼″ at the other end which makes it impossible to use any of these 9,000 pieces for the 3½″ dimension stock. Talking to Mr. Rygel this morning, he advised us to rip these pieces to 2½″ wide and on his next car he would send us 9,000 additional pieces of 3½″ wide stock and would short us 9,000 pieces 2½″ wide which would equalize the two cars. We will of course keep the time cost on ripping these 9,000 pieces and will keep it as low as possible as we realize it was an error in the shop and certainly no fault of Mr. Rygel's. When I talked to him he was very nice about the entire matter and we feel very happy that we have the association with him and yourself.

"With best personal regards. Very truly yours, The Commander Door, Inc. Edward N. Howell. h/t—cc: Dunsmuir Lumber Company."

---

"Mr. Edward N. Howell     July 27, 1950
The Commander Door, Inc.
Holmes, Pennsylvania

"Dear Ed: I am in receipt of your letter of the 25th. Mr. Rygel telephoned me that you were in communication with him and that the mill will proceed with your shipments.

"With reference to this being a firm order. My discussions with the mill and subsequent representations to you were to that effect. However, your initial order of February 17th stated: 'The price quoted is firm. However, when general market conditions are lower, prices are to be adjusted.' This order was not acceptable and was returned. I do not have a copy of the present order in my office.

"As stated in our telephone conversation, normal increases were to have been absorbed and the mill has done so. However, not only labor insisted upon a larger than average increase but everything else including the Forest Service increasing timber under contract necessitated this request for an increase. As previously pointed out, the mill absorbed this loss as long as possible but it finally

er and Bennett prior to the execution of the contract of March 3, 1950. One of these letters, dated February 20, 1950, from Dunsmuir to Commander, discloses that prior to the March 3, 1950 purchase order, an earlier order on the same printed form had been sent by Commander to Dunsmuir who had returned it with suggested changes. As originally submitted, it contained the following paragraph: "The price is quoted are firm. However, with general market conditions our lower prices are to be adjusted." The letter discloses that upon the suggestion of Dunsmuir this paragraph was changed to read as in the final executed agreement—"The prices on this order are firm."

As Commander first made its case, it was clear that its theory was that it was entitled to recover for a breach of the contract of March 3, 1950, as written and without modification. At the start of the trial the following colloquy took place between court and counsel for the appellant: "The Court: What is the contention here, that this contract is partially in writing and partially verbal? Mr. Anderson: No; as I understand the issue from the plaintiff's standpoint, it is simply this, your Honor: my client, the Commander Door Company back east ordered certain cut lumber from the defendant under an order which is now Plaintiff's Exhibit Number 1. The order was accepted by the defendants. The Court: Your position is that the contract is complete in and of itself? Mr. Anderson: Complete in and of itself."

■ When motion to dismiss the cause of action based upon the March 3, 1950 contract was made upon the ground that the contract provided that it might be canceled at any time, Commander argued that this printed provision of the contract was canceled out by certain language typewritten upon the order form reciting, "The prices on this order are firm" and "Quantity of cars can be decreased or increased as required in cooperation with the manufacturer."

The trial court correctly pointed out that there was no conflict between these printed and typewritten provisions, for while it was recited that *the prices* were firm, there was no similar undertaking with respect to quantities.

■ Commander then urged that the printed provision with respect to cancellation was one which granted the privilege of cancellation to Commander, the buyer, only, and that it granted no such privilege to Dunsmuir, the seller.

That argument is also made to us upon this appeal. It is true that the cancellation clause quoted above could be construed in either of two ways,—as though it read "may be canceled *by us* at any time, without cost to us", or, "may be canceled *by either party* at any time, without cost to us." But even if it were given the first construction, which is urged here, yet appellant is confronted by a California rule which makes it immaterial which version is given this provision.[3] This rule is stated in

resolved itself to either getting an increase or shutting that plant down. You cannot continue to operate at a loss. Frankly, all Mr. Rygel expects the plant to do is break even on your orders.

"Your cooperation and understanding in this respect was necessary and appreciation will be evidenced by prompt shipments and any other service which can be rendered.

"The narrow shorts contained in MEC 4782 are a surprise to me because all stock is ripped and cut to size by the same operators as in the past. However, there has been a recent change in supervision which may account for same. I cannot understand how all can be narrow, so please check each piece before ripping to 2½".

"I am still expecting you next week. Please let me know what day that will be. Kindest personal regards. Cordially, /s/ TED BENNETT TDB : mw— cc: Dunsmuir Lumber Co. [In longhand]: I have an idea on your house doors and will cover same during your visit—B."

3. The law of California governs this contract, which became effective by an acceptance which took place in California. Restatement, Conflict of Laws, § 326(b); Johnson v. Banta, 87 Cal.App.2d 907, 198 P.2d 100; Hardy v. Musicraft Records, 93 Cal.App.2d 698, 209 P.2d 839; Bank of Yolo v. Sperry Flour Co., 141 Cal. 314, 74 P. 855, 65 L.R.A. 90.

Fabbro v. Dardi & Co., 93 Cal.App.2d 247, 251, 209 P.2d 91, 93, as follows: "In the case of an instalment contract, like this one, the contract if subject to cancellation by one party at any time is binding only to the extent to which it has been performed and is revocable by either party as to the portion not yet performed. 'The law is well settled that, where a contract for the future delivery of personal property confers upon either party an arbitrary right of cancellation prior to delivery, it is lacking in mutuality and will be held binding upon the parties only to the extent that it has been performed.' "

Whether we would agree as to the soundness of the rule thus stated is not important here, for we must apply the law of the State of California. Appellant has not challenged the Fabbro case, nor questioned the rule there stated. Read in the light of that law, the clause relating to cancellation operated to grant the privilege of termination at any time to either party and to furnish Dunsmuir a complete defense.

■ Commander contends, however, that the court was in error in not permitting it to introduce the evidence it offered when it was allowed to reopen its case. It says that the acts and conduct of the parties which appellant sought to prove would disclose that the parties placed a construction upon the contract to the effect that both prices and quantities were fixed and unalterable. We think the contract was not of such character as to permit the receipt of the evidence for this purpose.

The contract as written, in view of the controlling California law, is not ambiguous, and such evidence was not admissible to explain the meaning of its terms. If the purpose was to add something to the agreement, the parol evidence rule would forbid the introduction of evidence of prior negotiations. While it is recognized that the practical construction which the parties to a contract unite in giving it, may furnish a useful clue as to its meaning, yet here, if the conduct of the parties proves anything, it is that Dunsmuir, at any rate, treated the contract as one permitting it to cease deliveries at any time, for when the month of July came around, we find it insisting upon a higher price as a condition of further deliveries.

■ Another contention made is that the letters written subsequent to the execution of the contract operated to modify the prior contract. These are the letters of July 25 and July 27, 1950, which are set out in footnote 2. These were letters written to and by Bennett, the lumber broker. Appellant offered to prove "that Mr. T. D. Bennett, whose name has been mentioned here, during all the times mentioned, was a representative of the defendant company." The offer did not reach the point of proof that Bennett was a representative authorized to make or modify contracts on behalf of the defendant company. But, assuming the sufficiency of the offer as to Bennett's authority, we think that the letters fall short of disclosing any modification of the written agreement.

The letter of July 25 has two aspects. In the first place, Commander asserts that the order of March 3, 1950, "was a firm order". After protesting the 7% increase, Commander alludes to "our firm order to you" and says that it has no alternative but to agree. Up to this point, Commander was simply stating its interpretation of the March 3 agreement. In the second place, the letter says: "It is my understanding after talking with Mr. Rygel that he will proceed to make shipment in accordance with the schedule with doors he is to manufacture for us." This statement could well be construed to mean that appellant presently understood that appellee would now, after appellant had agreed to the price increase, undertake to complete the full schedule of shipments. When we examine the reply to that letter, we note that Bennett admitted that his earlier discussions with the parties were to the effect that the March 3 writing was a "firm order". He says: "With reference to this being a firm order. My discussions with the mill and subsequent representations to you were to that effect." He refers to the first order which was not acceptable and was returned,

states that he does not have a copy of the March 3 order, and proceeds to explain why Dunsmuir was justified in demanding an increase in prices. It seems to us that Mr. Bennett was inclined to agree with Commander as to the intention of the parties to execute a "firm order". But the significant fact is that he did not undertake to agree with the second proposition stated in Commander's letter to the effect that the appellee would now undertake to make shipments in accordance with the schedule and in full. We think that this exchange of letters falls short of any proof of a subsequent modification of the original agreement to the effect that all quantities listed on the order would be delivered per schedule and without omission.

We are therefore of the opinion that the trial court properly rejected the evidence offered in support of appellant's modified theory of its case; that the trial court correctly construed the contract between the parties as one permitting appellee to cancel future deliveries at any time, and accordingly the judgment is affirmed.